```
             UNITED STATES DISTRICT COURT
              DISTRICT OF NEW HAMPSHIRE
```

Cathy Stoumen Johnson

    v.                                  Civil No. 13-cv-525-JL
                                            Opinion No. 2015 DNH 051

Commissioner, Social
Security Administration


**ORDER ON APPEAL**

Cathy Stoumen Johnson has appealed the Social Security Administration's denial of her application for a period of disability and disability insurance benefits. An administrative law judge at the SSA ("ALJ") ruled that, despite Johnson's severe impairments (major depressive disorder and generalized anxiety disorder), she retains the residual functional capacity ("RFC") to perform jobs that exist in significant numbers in the national economy, and, as a result, is not disabled. See 20 C.F.R. § 404.1505(a). The Appeals Council later denied Johnson's request for review, see id. § 404.968(a), with the result that the ALJ's decision became the final decision on Johnson's application, see id. § 404.981. Johnson then appealed the decision to this court, which has jurisdiction under 42 U.S.C. § 405(g) (Social Security).

Johnson has filed a motion to reverse the decision. See L.R. 9.1(b)(1). She argues that, in ruling that she was not disabled, the ALJ improperly discounted the opinions of her

treating physicians in favor of those of non-treating sources. As a result, Johnson maintains, the ALJ erroneously found neither that Johnson suffered from a listed impairment--which would have led to a finding that she was disabled without regard to her RFC, 20 C.F.R. § 404.1520(d)--nor that she lacked the RFC to perform jobs existing in significant numbers in the national economy, id. at 404.1505(a).  The Acting Commissioner of the SSA has cross-moved for an order affirming the ALJ's decision, see L.R. 9.1(d), defending the ALJ's handling of the opinion evidence.  As explained fully below, the court agrees with the Commissioner, and therefore grants her motion to affirm (and denies Johnson's motion to reverse) the decision.

**Treating source opinions**

Johnson claims that the ALJ erred by giving only limited weight to the opinions of three of her treating doctors:  Dr. Dominic Candido, her pyschologist; Dr. Adam Schwarz, her primary care physician; and Dr. Danielle Dahle, her psychiatrist.  As Johnson points out, an ALJ must give controlling weight to the opinions of a treating physician "[i]f [the ALJ] find[s] that a treating source's opinion on the issue(s) of the nature and the severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

2

evidence in [his] case record." 20 C.F.R. § 404.1527(c)(2). In declining to give controlling weight to the opinions of Drs. Candido, Dahle, or Schwarz, the ALJ found these opinions "neither consistent with nor supported by the evidence of record, including the treating source's own treatment notes." Johnson argues that this finding lacks substantial evidence to support it as to any of the doctors in question. The court disagrees.

**Dr. Candido.** As the ALJ noted, Candido opined that Johnson "had severe limitations in attention and concentration" as well as that her "symptoms preclude occupational functioning due to her difficulty with sustained mental effort, novel tasks, and high demands." Candido had expressed these opinions on an "Attending Physician's Statement of Disability" form he had completed for submission to an insurance company in late April 2012. He also indicated on the form that Johnson had "no ability" to do a number of other things, including "perform repetitive or short-cycle work," "work alone or apart in physical isolation from others," "perform effectively under stress," or "deal with people," as well as "minimal ability to perform a variety of duties[,] work under specific instructions, or demonstrate reliability and consistency."

In giving Candido's opinions "little weight," the ALJ pointed out that his "notes show that [Johnson] at times had clear or remarkably clear mental status"--the ALJ elaborated

3

elsewhere in the opinion that "many of Dr. Candido's notes are illegible, but those that are legible reflect clear or remarkably clear mental status, as well as reports of improved mood." The ALJ also observed that, on the very same form on which Candido had indicated his opinions as to Johnson's severe limitations, he had also noted that her "panic was less intense and less frequent, her dissociative states were fewer in number, and her mood was less depressed" (though her "concentration and memory remained problematic"). The ALJ also relied on Johnson's "own report that she can complete simple tasks of two to three steps," as she stated on the "Function Report" she submitted to the SSA in support of her application.

In attacking the ALJ's handling of Candido's opinions, Johnson complains that "the ALJ indifferently dismisse[d] the treatment notes as illegible," rather than "[c]ontacting [Candido] and asking for clarification." But Johnson had been represented by counsel for nearly a year by the time of the hearing before the ALJ, so her attorney, by all rights, should have been the one ensuring that the medical records he presented in support of his client's claim were legible. See Faria v. Comm'r of Soc. Sec., 187 F.3d 621 (table), 1998 WL 1085810, at *1 (1st Cir. Oct. 2, 1998).

Offering her own interpretation of certain of Candido's notes in her motion, Johnson also argues that they in fact

contain "frequent notations" at odds with the ALJ's observation that they reflect favorably on her mental status. But, however accurately Johnson may have deciphered the notes, the joint statement of material facts--which Johnson, through counsel, agreed to as "all facts pertinent to the resolution of the case," L.R. 9.3(d)--contains no support for her interpretation. To the contrary, the statement describes Candido's treatment notes as "largely illegible," and, aside from describing the note of Johnson's initial visit with Candido as documenting a "report of panic," says nothing further about them but that they "document treatment approximately bi-weekly to twice weekly."

On this record, the ALJ did not err in finding that what Johnson admits are Candido's "largely illegible" notes failed to support his opinions as to her severe limitations--nor, for that matter, in declining to do what Johnson's counsel, both before the ALJ and on appeal to this court, likewise declined to do.[1] See Carrion v. Colvin, 2014 DNH 174, 7-8.

---

[1] Johnson also remarks that "the ALJ was (with all due respect, miraculously) able to read the portions of the notes he could take in the light least favorable to her," but "was apparently unable to read" the notations that allegedly support Johnson's disability claim. Again, Johnson's counsel also did not endeavor to read Candido's treatment notes, at least not when preparing the joint statement of facts, but, in any event, the note on which the ALJ specifically relied in rejecting Candido's opinions was an entry on the insurance form, which was printed in block lettering. That the ALJ could read that but not what Johnson herself calls the "largely illegible" cursive handwriting from Candido's treatment notes is hardly "miraculous."

Johnson also argues that, even though (as just referenced) she "met twice a week with [Candido] dating back to February 2011," any "[c]onsideration or even mention of this longstanding treatment relationship is missing from the ALJ's analysis" (italicization omitted).  It is true that SSA regulations direct an ALJ, in weighing the opinion of a treating source, to consider--among several other factors--the "[l]ength of the treatment relationship and the frequency of the examination."  20 C.F.R. § 404.1527(c)(2)(i).  As this court has observed, though, § 404.1527(c) "lists factors for the ALJ to consider in deciding how much weight to give any medical opinion, [but] it stops short of 'requiring an ALJ's decision to expressly apply each of the six relevant factors.'"  Chapin v. Astrue, 2012 DNH 177, 9 (quoting Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007)).  Instead, the rule simply requires the ALJ to "give good reasons in . . . [his or her] decision for the weight [he or she] gives [a] treating source's opinion."  20 C.F.R. § 404.1527(c)(2).

Notwithstanding its omission of any reference to the length or intensity of Candido's treating relationship with Johnson, the ALJ's decision gave the requisite "good reasons" for giving Candido's opinions little weight.  In addition to the fact that those opinions found little if any legible support in Candido's records, the ALJ also expressly relied on the conflict, noted supra, between Johnson's statement in the Function Report that

6

she could "complete simple tasks of two to three steps" and Candido's view that Johnson's "severe limitations in attention and concentration" left her with "no ability" to do even "repetitive or short-cycle work." Johnson's motion to reverse does not address this conflict, which the ALJ was free to take into account in evaluating Candido's opinions. See Scanlon v. Astrue, 2013 DNH 088, 17-18 ("[i]n assessing whether a treating source's opinion is consistent with the record, an ALJ is of course free to consider the claimant's contrary statements"). The ALJ's decision to give Candido's opinion little weight was both sufficiently explained and sufficiently supported.

**Drs. Dahle and Schwarz**.  Dahle, a psychiatrist who saw Johnson once in July 2011 and three more times between January and July 2012, completed two forms in July 2012 indicating that, due to her depression and anxiety, she suffered from a number of limitations. Among other things, Dahle opined that, due to her depression, Johnson had "moderate difficulties in social functioning and maintaining concentration, persistence or pace," and that due to her anxiety, she faced "moderate restriction of activities of daily living" and "marked difficulties in maintaining social functioning, persistence, or pace."

In August 2012, Schwarz, Johnson's primary care physician, completed the same "Depression" and "Anxiety" questionnaires as Dahle, indicating even more serious findings. Schwarz opined

7

that, due to Johnson's depression, she faced "marked difficulties in social functioning and maintaining concentration, persistence or pace" and that, due to Johnson's anxiety, she faced "marked restriction of activities of daily living and marked difficulties in concentration, persistence, or pace."[2]

The ALJ found that, while Dahle's "opinion regarding [Johnson's] depression and its impact on her ability to function is largely consistent with [Dahle's] own treatment notes and with the remainder of the evidence of record," her "opinion regarding [Johnson's] anxiety is, however, not given significant weight as it is not consistent with the evidence of record."  The ALJ observed that Dahle's view of Johnson's anxiety-related limitations was inconsistent with Dahle's treatment notes, which "show that [Johnson] presented with intact attention,

---

[2] Both Dahle and Schwarz also opined that Johnson faced "repeated episodes of decompensation" and that "even a minimal increase in mental demands or change in environment would cause [Johnson] to decompensate"--and, further, identified a "current history of one or more years' inability to function outside a highly supportive living environment with an indication of continued need for such arrangement."  But Johnson, in her motion to reverse, does not argue that the ALJ should have credited these opinions, so the court need not address them.  In any event, they lack support in the record--which, as the Commissioner points out, reveals but one episode of decompensation and no inability to function outside a "highly supportive living arrangement" (such as an inpatient facility).  It is worth noting, however, that these doctors' willingness to indicate limitations so drastic that Johnson herself has not seen fit to defend them in court does not speak particularly well of the credibility of their other opinions.

concentration, and memory." The ALJ also expressly relied on Johnson's own "reported level of functioning."

As to Schwarz's opinions, the ALJ likewise gave them "limited weight as [they are] not supported by or consistent with the evidence of record." The ALJ explained that Schwarz's "opinion of the impact depression has upon [Johnson's] functioning . . . is not consistent with his own treatment notes," which "indicate that [she] did not present with any signs or symptoms of depression." The ALJ further explained that Schwarz's notes "describe [Johnson's] anxiety as mild to moderate in intensity. This is not consistent with his opinion of moderate to marked functional limitations, or an inability to function adequately outside the home." Finally, as he had in giving little weight to Dahle's opinions of Johnson's anxiety-related limitations, the ALJ observed again that Johnson "engages in a wide range of activities, both in and out of the home."

In challenging the ALJ's handling of Dahle's and Schwarz's opinions, Johnson disputes his characterizations of their treatment notes, pointing to observations of tearfulness and similar symptoms, an anxious mood, or merely "fair" insight. Despite these entries, the court believes that the ALJ supportably found that, as a whole, Dahle's and Schwarz's notes do not support their opinions that Johnson suffered from

9

moderate or marked restriction of activities of daily living and marked difficulties in maintaining social functioning, persistence, or pace.

In any event, in discounting those opinions, the ALJ also relied on Johnson's "reported level of functioning," which included "a wide range of activities, both in and out of the home." As the ALJ found, Johnson described her own activities as regularly preparing vegetarian meals from scratch (taking up to two hours per day), cleaning the house daily "without encouragement or help," walking or swimming for exercise every day, running multiple errands in one trip "without any reported difficulty," and "an active social life that involves physical activities" including kayaking and tennis with friends.

Johnson's motion to reverse does not question the ALJ's characterization of any of her reported activities. Nor, more importantly, does Johnson's motion address the rather stark conflict between Dahle's and Schwarz's opinions that Johnson suffers from a moderate or marked "restriction of activities of daily living" and "marked difficulties in maintaining social functioning, concentration, persistence or pace," on the one hand, and, on the other, her own account of a robust regimen of daily activities that, frankly, would put a completely healthy, and much younger, person to shame (Johnson was 62 at the time of the hearing before the ALJ). As the ALJ defensibly--if not

10

inevitably--reasoned, Johnson's "ability to participate in these activities is not consistent with marked limitations, as these activities show that she can leave the house independently on a regular basis, sustain the attention and concentration needed to run errands, attend appointments, and shop," as well as routinely "prepare meals using fresh ingredients for sustained periods of time, and complete household chores."

Again, in weighing the opinion of a claimant's treating doctors as to his or her limitations, an ALJ may properly consider the claimant's contrary statements as to her own abilities. Scanlon, 2013 DNH 088, 17-18. Indeed, "there will be an obvious inconsistency between [such an] opinion and the other substantial evidence . . . when a treating source's report contains an opinion that the [claimant] is significantly limited in the ability to do work-related activities, but the opinion is inconsistent with the statements of the [claimant] about [his or her] actual activities." Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, SSR 96-2p, 1996 WL 374188, at *3 (SSA 1996). In light of the remarkable disparity between Johnson's own account of her daily activities and Dahle's and Schwarz's opinions that Johnson was moderately or markedly restricted in those activities, as well as plagued by marked difficulties in social functioning and concentration, persistence, or pace (a disparity which, again, Johnson does not

11

even attempt to address in her motion to reverse) the ALJ did not err in giving little weight to Dahle's and Schwarz's views of Johnson's anxiety-related limitations.[3]

**Consulting source opinions**

The ALJ found that Johnson retained the RFC "to perform a full range of work at all functional levels," but with a number of "non-exertional limitations," including: "simple, unskilled work performed in a low stress environment, which is defined as limited to no changes in the work setting and little to no need for use of judgment," "occasional social interactions with the general public and coworkers," and "maintain[ing] attention and concentration for two-hour increments throughout an eight-hour workday." The ALJ based this conclusion on the opinions of two psychologists who did not treat Johnson: Laura Flashman, who completed a comprehensive neuropsychological evaluation of her in August 2011, and William Jamieson, who reviewed Johnson's case

---

[3]Johnson also charges that, in assessing Dahle's and Schwarz's opinions, "the ALJ's analysis disregards altogether the evidence of repeatedly assessed a [*sic*] global assessment of functioning, GAF, score [*sic*] of 41-50, indicating serious symptoms over a protracted period of time." As this court has repeatedly noted, though, "there is no 'statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score in the first place,'" Chapin, 2012 DNH 177, 14, (quoting Kornecky v. Comm'r of SSA, 167 Fed. App'x 496, 511 (6th Cir. 2006)), particularly when those scores indicate functional limitations that are hopelessly at odds with the claimant's own account of her abilities.

for the state Department of Health and Human Services in September 2011.  Johnson argues that the ALJ's consideration of this evidence was in error.  The court disagrees.

Flashman took the results of her testing to indicate Johnson's "generally intact executive functioning across a wide range of tasks with some evidence of subtle difficulty with monitoring of task performance."  Flashman also noted, however, that Johnson "endorsed significant affective distress that might impact her cognitive functioning to some degree; difficulty deploying focused attention and working to maximal capacity, as well as organization and memory functioning, were often compromised in this context."  While the ALJ observed that Flashman "did not provide a function-by-function assessment of [Johnson's] abilities and limitations," he nevertheless accorded Flashman's "opinion significant weight, as it provided objective evidence of [Johnson's] cognitive abilities and limitations."

Johnson argues that Flashman's conclusion "that once emotional distress entered the equation, [] Johnson's ability to carry out . . . cognitive functioning would become compromised[] is precisely the heart of her impairment," making Flashman's opinions "consistent with that of the treating physicians."  It is true that both Flashman and Johnson's treating doctors had found her mood disorders to impact her functioning--but so did the ALJ, who, as just noted, limited Johnson to working in a "low

13

stress" environment with no more than occasional social interactions and the need to maintain concentration in only two-hour increments. Johnson does not endeavor to explain how those limitations are at odds with any of Flashman's opinions.

Instead, Johnson maintains that the ALJ could not have simultaneously adopted Flashman's view while rejecting the "consistent" view of Johnson's treating physicians. While, again, those views were "consistent" in kind insofar as they both saw Johnson as limited by her mood disorders, they were inconsistent in degree--nothing in Flashman's findings suggests the marked limitations in activities of daily living, or the marked difficulties in social functioning and concentration, persistence, or pace, found by Dahle and Schwarz, nor, for that matter, the total inability to do even "repetitive or short-cycle work" found by Candido. Johnson does not argue otherwise. Furthermore, the ALJ did not reject the opinions of Johnson's treating physicians because they were inconsistent with Flashman's but rather because, as just discussed at length, they were inconsistent with those physicians' notes and, moreover, Johnson's own account of her capabilities. Johnson has failed to show, then, that the ALJ erred in either his interpretation or his use of Flashman's findings.

Moreover, while, as the ALJ observed, Flashman did not "provide a function-by-function assessment of [Johnson's]

14

abilities and limitations," the ALJ did not rely solely on Flashman's opinions in formulating Johnson's RFC. The ALJ also relied on the opinions of Jamieson, who--in contrast to the views of Dahle and Schwarz--found only "mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, with no repeated episodes of decompensation." Jamieson further found that Johnson suffered from no limitations in understanding, memory, or social interaction, but that she had "the ability to deal with only simple and routine changes in the work setting" as well as "some impairment in [her] ability to maintain persistence to task over extended periods, but this would not be at an acceptable level."

Johnson challenges the ALJ's reliance on Jamieson's opinions solely on the ground that his "review in this case occurred in September 2011, a year before the ALJ decision" and, as a result, "did not consider the treating source opinions," rendered in the spring and summer of 2012.[4] As already discussed at length, though, the ALJ properly found that those opinions (insofar as

---

[4]Johnson also asserts that Jamieson did not "have available any comprehensive reports from her medical specialists (psychiatry and psychology)." But she does not, by citation to the record or otherwise, identify these alleged "comprehensive reports" so, insofar as she means to refer to something other than the forms on which Candido, Dahle, and Schwarz expressed their opinions, the court simply cannot evaluate her argument.

15

they suggested limitations greater than those he incorporated into his RFC finding) lacked support in--and, indeed, were contradicted by--the balance of the record.  So it was likewise appropriate for the ALJ to rely on the opinions of a state agency consultant that "failed" to take those unsupported opinions into account, at least where, as here, Johnson fails to specifically identify anything else in the records of her treatment post-dating Jamieson's report that undermines his conclusions in any way.  See Comeau v. Colvin, 2013 DNH 145, 18-19, aff'd without opinion, No. 13-2542 (1st Cir. June 25, 2014).  The ALJ did not err in relying on Jamieson's opinions.

**Conclusion**

As this court has observed, an ALJ can rely "exclusively on the assessments of non-testifying, non-examining physicians" in adjudicating a claimant's RFC, and conflicts between those assessments and other medical testimony "are for the ALJ to resolve."  Morin v. Astrue, 2011 DNH 091, 9-10 (citing Berrios Lopez v. Sec'y of HHS, 951 F.2d 427, 431-32 (1st Cir. 1991)) and Tremblay v. Sec'y of HHS, 676 F.2d 11, 12 (1st Cir. 1982)).  Furthermore, "[t]he ALJ decision to resolve that conflict against the claimant should be affirmed if "'that conclusion has substantial support in the record.'"  Id. (quoting Tremblay, 676 F.2d at 12).  Because, for the reasons just explained, that is

the case here, Johnson's motion to reverse the ALJ's decision[5] is DENIED, and the Commissioner's motion to affirm the decision[6] is GRANTED. The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_/s/ Joe Laplante_
Joseph N. Laplante
United States District Judge

Dated: March 12, 2015

cc: Karl E. Osterhout, Esq.
    Daniel McKenna, Esq.
    T. David Plourde, AUSA

---

[5]Document no. 7.

[6]Document no. 12.